Should I proceed? All right. How much time would you like to reserve for rebuttal, Mr. Olson? Let's go three minutes. Okay. All right. Go ahead, please. Thank you, and may it please the Court, it's my privilege to be here today. We're here on the behalf of—I'm here, Nathan Olson, attorney from Idaho Falls, here on behalf of Clinton B. Rush. He was a plaintiff in a section 1983 claim of excessive force. Mr. Rush, we took four and a half years for a case to develop. And when there was a trial in April of 2020—excuse me, April of 2022, where he didn't receive a fair trial for various reasons, and we've laid out a number of issues in our brief. Obviously, I won't be able to get to all of them, but this really fundamentally has to do with a plaintiff in an excessive force case who may also still be incarcerated obtaining a fair shot at bringing his claims before a jury. And these are particularly—the one claim that Mr. Rush was bringing before a jury is in itself very troubling, and which everyone agreed would be excessive force if it were true, and that was the deployment of O.C. or pepper spray down the pants of Mr. Rush during a— during an episode that he had at a waste station, service station in Idaho. Everyone agreed if that occurred, then that is excessive force. And it's apparent in looking at the way that the defendants conducted themselves and conducted the case that they certainly knew that would be true. And so the entire case, the process before the case, was spent by the defendants and the respondents in this case filing motion after motion or trying to submit evidence that had nothing to do with the issue that was in the case. And Mr. Rush, for his part, he had an expert report that actually was not disputed. The findings of it were not disputed. And that is that there was a high residue of the components of O.C. spray found on the inside of his boxer shorts. Right, but the problem was those boxer shorts were with his T-shirt and pants that had been balled up in storage for a couple of years together, right? And there was evidence of at least arguably cross-contamination. Yes, well, Justice Gilman, and I'm glad you went there because— I used to be elevated to justice. It was just judge. Judge, okay. I'll go with judge. All right. And that, of course, is the point that the respondents tried to raise on the day of trial after having years of an opportunity for discovery to have their own expert analyze the clothes. And if you look at the record that we cite there, there were very deliberate efforts prior to trial to ensure chain of custody, to ensure that the evidence that was going to be put in front of the jury was viable and there was an opportunity for each side to examine it. And that's where the fact of the matter is that the cross-contamination issue was brought up on the day of trial and without any expert testimony and frankly in disregard of some very carefully administered court proceedings where everyone had agreed there had been no issue with the chain of custody and that each side had an opportunity to review and conduct testing. And at the end of the day, Mr. Rush had to put on, because the judge allowed it, despite it being very prejudicial to him, even then the expert in Mr. Rush's case indicated that was not of concern to them, but it never should have been an issue that should have been brought up in the first place. But the pants that were tested turned out not to be the pants he was wearing on the day of his arrest, right? There was pepper spray found on pants that he wasn't even wearing. At the end of the day, the pants are not nearly as relevant as the boxers. And as we point— The inference would be that if pepper spray was found on these pants that he wasn't even wearing, that they might have migrated to the boxer shorts, too, from what admittedly they pepper sprayed him in the chest area when he was attacked after he had swung and hit the officer in the face, right? Justice—or excuse me, Judge Gilman, I'm sorry. Again, I don't have time to go over all of the specific details of the entire incident and the clothing and how it played in there. What is your best argument, you think? What's the one you think we are most likely to set aside the jury verdict and grant you a new trial? What is your best fact of all the claims? Okay. And we have many, and I think the fundamental fairness issue, the plain error by having Mr. Rush appear in shackles. He was seen by the jury in shackles. He had several— But where in the record does it say he was seen by a jury in shackles? I know in your brief you say he was seen, but that's not the testimony that the defense counsel said during trial. If you're talking about the two jurors that saw him in transport? Yes, that's it, and that was— Nothing says in transport. If I look at the testimony, it says two of the jurors were behind the transport car and saw Mr. Rush in his jumpsuit. I don't see anything—and that's you, that's Mr. Olson at trial. So I don't see anything saying that the jurors saw him in shackles. So where is that coming from? That came in a statement that I made as Mr. Rush's counsel to the judge. No, but I'm looking at that. I'm looking at ER-2263. I don't see that at all in what you told the judge. What I may have to do in my rebuttal is point out where that statement is. I can't place my hands exactly on that record. All right. But I know, Sarah, I basically raised it with the judge. So I'll get back to that. I think the more important point is that there really was no dispute from that down in the lower court. I know that the— But can I ask you a question? If the jurors already knew that Mr. Rush had been arrested and had been in jail, at least at some point since the incident in question with the pepper spray, why would it have been more prejudicial to see him in prison guard? And that's a very good question. And I think this court addressed it very clearly in Claiborne. And, you know, there's a difference between knowing that someone is in custody but seeing them in shackles. It's the visual of that you have a violent person. Okay. And that in itself prejudices him from being able to have a fair trial on the issue of excessive force. Does it matter that there was a video of Mr. Rush showing him to be quite volatile at the time of the incident? I think there's a big difference. So where would the prejudice be? If you already see a video of him, I believe, striking one of these defendants and being quite volatile, where would the prejudice be then? Well, because that video was four and a half years prior to the trial, as well as the fact that he is going through a mental episode. And I think, to me, that was one of really the troubling issues of the way that this case was treated. And that is just basically putting my client's mental illness and the episode that he had at the time front and center, really to the point that he was absolutely demeaned for that. And, you know, just because someone is mentally ill or going to go to his credibility as to his recall and recollection of that incident? Well, I think that, yes, but it's something that has got to be very narrowly drawn. Because in the way, as we cited throughout this case, the way that the defendant's counsel, in particular, referred to that, it's essentially dehumanizing Mr. Rush. And I'll bring it back to your point, well, why wouldn't a video of him, you know, why would that not be the same as being in shackles? And I think it demonstrates that very point. It demonstrates that very point. When you don't draw a distinction between someone who is going through a mental crisis four and a half years early, where do they become agitated? And showing up in court with shackles and having three large guards sit behind him, which that is something that the judge acknowledges. He's not showing up in court in shackles, right? I thought it was just a leg restraint that the jurors could not see. Are you actually saying he was, in fact, shackled and not having a leg restraint during trial? Yeah, and when I'm using, Justice Koh, when I'm using the term shackles, I view it. Do you mean leg restraint when you say shackles? Because to me shackles means something else, but is that what you mean? I think that if we use the Claiborne view of it as he was seen in restraints or he was, and I think it's more than just like actual restraints. It has to be viewed metaphorically. But where is the evidence that the jurors saw his leg restraints? What I'm trying to do here is my understanding and the way I interpret this court is that when we talk about seeing someone in restraints, it's not just shackles, something on his legs. If you've got three massive prison guards sitting within arm's reach of you, that is the same thing as being shown in restraints. And the fact that that was the case is not disputed either throughout that entire trial. I see you're using up your rebuttal time. Okay, I'm going to reserve. All right, thank you. Three minutes, six seconds left. All right, Mr. Cain. Thank you, Your Honor. I'll go right to the issue that one of the judges raised about what is their best argument, and that seems to be the shackling issue. First of all, let me assert that no one can say for sure that jurors, one, two, three, whatever, saw him in his jumpsuit outside of the courthouse. This was raised by Mr. Olson on the last day of the trial. No evidence, nothing was presented to the judge to show that that actually happened, that in fact came from Mr. Rush himself. So we don't know that that actually happened. We don't know even if... Can I ask you about the prison guards? Certainly. This seems to be different than the Holbrooke case because you have people in, you know, Idaho Department of Corrections uniforms, not in, you know, state trooper uniforms. So it's clearly showing that Mr. Rush is incarcerated. You don't have them sitting behind the bar in the audience section. You have them... Actually, let me interrupt. They were behind the bar. But where is that in the record? Where is that in the record that they're behind the bar? It's not in the record anywhere, but that's the point. I just heard about three, quote, massive people sitting behind him. And that's just simply not true, and it's not in the record. Well, what is in the record as to the location of the Idaho Department of Corrections guards? The trial judge was painstaking in describing where they were located. There were two, not three, first of all. And he describes where they are. So wasn't one behind Mr. Rush and another one was between Mr. Rush and the jury? No. To his... No. I'm sorry, no. That's not what happened. It's not in the record. I can tell you where they were. What does the judge say where these two guards were? Well, I will have to find, if you'll give me a moment, his order. But it's in there. Let me see if I can find it. Now, there looks like in the record that the district judge originally said that there would be a marshal presence. And then somehow it switches to IDOC without at least anything from the record that says why that switch happened and whether the district judge just deferred to IDOC as to whether they needed to come in their IDOC uniform, where they needed to be located. It looks like the district judge may have advocated some of that decision-making as to the security measures to the IDOC. The court explains how he got there. He originally...  I'm sorry. I'm going to look right now. The memorandum decision, ER 13, this is what it says. And because Mr. Rush remained in IDOC custody throughout trial, two IDOC officers were likewise required to be present, each seated behind and off to the side of Mr. Rush. A single USMS deputy was also positioned in the front corner of the courtroom, closer to courtroom personnel for the duration of the trial. So I don't see what you're saying that that says where they were located. I hear you. That's what the court record is. That's the state of the record. So they said each seated behind. So where... Yes. My recollection, it was behind the bar. I can't tell you for sure, 100%. That's the state of the record. Let me assert, if I may... Wait, wait. Your recollection is not the state of the record. ER 13 is the record, correct? Yes. Nevertheless, let me assert the issue is whether or not the jury saw Mr. Rush as an unacceptable threat and that the right to fair trial has been overridden by the fact that there were two IDOC guards in the room. Let me assert that there was never any objection ever about this. If there had been, it could have been cured in any number of ways, I would presume. And that there is simply, in light of this case, where appellant's counsel was bringing up on his own the criminal history of this defendant, from voir dire to closing argument, where the jury saw the man on video strike an officer. In light of that, it could not have been a secret to anyone that this person had been incarcerated and was incarcerated. And overall, I do not believe this was an unacceptable threat to the defendant's right to fair trial. I don't see... Before you ask your question, I actually would just appreciate if you would move a little bit away from your mic, because sometimes when you rock towards the mic, and then it gets too loud. So if you just... It's just, I want to be able to follow what you're saying, and the movement is disrupting the sound. Go ahead. I'm sorry. No worries. So on ER 2471, the district court says, we will make sure that there is an unobtrusive martial presence here. I'm not going to order restraints for the plaintiff in a civil case. That would certainly prejudice him in the eyes of the jury, and I'm quite confident that the marshals and the court security staff... And then, Mr. Cain, you say, I don't want to argue. There are ways to restrain on ankle under the table that nobody knows about, and the court says, all right, I take your argument. But then all of a sudden, then we go to the district court order, which then has... Well, because the IDOC is incarcerating him, they have to be present in the courtroom, and I don't see where that individualized security to determination was made. It may just be that it's not part of the record for this appeal, but... I truly believe that's not part of the record. It was never explained to us that I know of as to why the court made that decision. There were IDOC people in the room, no question about it.  Go ahead. Thank you. The question, of course, is whether or not that prejudice permeated the entire trial. What we have here is an individual who was making implausible claims about being pepper-sprayed down his pants, and there was much testimony about that from the plaintiff appellant. But there were also three officers and four eyewitnesses that all say that that didn't happen. We also have people arriving at the scene, EMTs, a supervisor for the ISP officers. He was later taken to the jail, and he was interviewed by a jail nurse, and he was interviewed by a jailer, and never does he make these claims until much, much later during his criminal prosecution. Taking all that together, it was pretty overwhelming that his implausible story held no weight. As a result of that, plus the fact that they fronted the fact that Mr. Rush had been in prison, they had him read his own statement to ISP when he first made his claim, in which he described he had been in prison. He talks about it at length in numerous places. And then there's the video, where during the discussion involving what should we do about this gentleman who was clearly ill, but was also on parole, all of this information was put in front of the jury and stipulated to by the plaintiff's counsel. So there can hardly have been a situation where it was unduly prejudiced and unacceptable to have IDOC people sitting quietly in the room. So I don't have a great deal more to say on that issue. I would simply ask the court to look at the whole record, and I just don't believe it was an acceptable threat to a fair trial. Rather than jump into the weeds about other things, I'm more than happy to talk about any other issues the court has with this. I don't have any questions. Gilman, Judge Sung, we don't have any more questions. Alright, well I'll simply end with answering the question about cross-contamination. That was actually put forward in front of the jury by the plaintiff appellant's witness. We responded to it, we were allowed to argue it, we did, and it was pretty obvious that he had cross-contamination here. So I'll stop with that. Alright, thank you. Mr. Olson, I guess you have three minutes. Is that right? Yeah. Go ahead, please. Well, I'll continue on with this being seen in restraints issue, and I think it's clear to the court that we're interpreting both. But having those prison guards there, I mean, the record is very clear on that. Is it true? I mean, you can say that you did not object at the time of trial to those guards being behind your client. Well, I'll make two points there. Number one is that if we're going to follow the Claiborne standard, it is plain error. It is something that does not have to be objected to. There are some things that are so inherently prejudicial that no objection is needed. But I will also point out, too, that we did raise the issue. Actually, it was Mr. Cain who raised the issue at the prior proceeding where, as Justice Koh just noted, the judge was clear about the minimal, minimal types of restraints be in place at that time of the trial. And then he did something completely different. And I, as an attorney, do not have to object to the same thing several times. So once we've objected and we basically have been overruled, we preserve that for an appeal. And in this trial, we lodged 48 objections that were not waived by the court. Or, excuse me, yeah, were not waived but also where the judge, we were overruled. And, excuse me, Justice Gilman, I know earlier you had, Judge Gilman, earlier you had, I'm wondering. I'll get there. It's the air. But you'd mentioned earlier, Justice Gilman, just Judge Gilman. I should just stop falling behind. About cherry picking, about, you know, parties picking out facts in the record that seem to support their position. And that is what I would describe exactly what the approach is of the respondents to our appeal, is to try to go through the longitude of the record, if you will, and pick things out of context. And then standing up and then giving their own take on the facts in this case. But it was highly, highly prejudicial for Mr. Rush throughout the entire case. I think this Clairborn issue stands out. But what is particularly troubling is it essentially was a character assassination. And it was pervasive throughout the entire proceeding. And I urge the court to take all of that into consideration. I think there has been fundamental error in this case. But I also think there are some evidentiary issues that you need to take a look at, if you were going to remand it, on the experts and the evidence without foundation, evidence that was beyond the scope, so on and so forth, as we brief. Thank you. All right. Thank you very much. Thank you to both counsel for your very helpful arguments. And thank you, Ms. Dodds. We are adjourned. This sitting is done.
judges: Gilman, KOH, SUNG